# 2024-1971

In The

# United States Court Of Appeals
## For The Federal Circuit

## In re:  WAG ACQUISITION, LLC,

*Appellant.*

ON APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE
PTO-1 : 90/014,833

_____

## REPLY BRIEF OF APPELLANT

_____

**Ronald Abramson**
**Ari J. Jaffess**
**LISTON ABRAMSON LLP**
**The Chrysler Building**
**405 Lexington Avenue, 46th Floor**
**New York, New York  10174**

*Counsel for Appellant*

# <u>TABLE OF CONTENTS</u>

**Page:**

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION ....................................................................................... 1

ARGUMENT ...............................................................................................4

    I.    THE DIRECTOR FAILS TO SUPPORT ANTICIPATION OF
        LIMITATION [1.i.1]: REQUESTS BY SERIAL NUMBER
        FROM MEDIA PLAYER TO MEDIA SOURCE ................................4

        A.    Hill has no Express Disclosure that "the media player …
               transmit[s] to the media source a request to send one or
               more media data elements, each identified by a serial
               number" ........................................................................................4

        B.    "Instructions to Cause" Does not Change the Result ................7

    II.    THE DIRECTOR FAILS TO SUPPORT ANTICIPATION OF
        LIMITATION [1.g]: MAINTAIN RECORD OF THE SERIAL
        NUMBER OF LAST MEDIA DATA ELEMENT RECEIVED
        AND STORED ..................................................................................15

    III.    THE DIRECTOR FAILS TO SUPPORT ANTICIPATION OF
        CLAIM 4: RECEIVE THE PREDETERMINED NUMBER OF
        MEDIA DATA ELEMENTS AT A RATE MORE RAPID
        THAN THE [PLAYBACK] RATE ....................................................21

        A.    Claim Construction: "the predetermined number" in
               Claims 1 and 4 ...........................................................................22

               1.    Claim 4 Antecedents ......................................................23

               2.    Specification Disclosure ................................................25

        B.    Hill Does not Disclose Claim 4 as Properly Construed ...........26

CONCLUSION .........................................................................................28

CERTIFICATE OF COMPLIANCE .........................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s):**

*Arendi S.A.R.L. v. Oath Holdings Inc.*,
    2019 WL 3891150 (D. Del., Aug. 19, 2019) ..................................................27

*Apple Inc. v. Andrea Electronics Corp.*,
    949 F.3d 697 (Fed. Cir. 2020)..........................................................................12

*Conoco, Inc. v. Energy & Env't Int'l, L.C.*,
    460 F.3d 1349 (Fed. Cir. 2006).........................................................................27

*In re Express Mobile, Inc.*,
    No. 2023-1076, 2024 WL 2747287 (Fed. Cir. May 29, 2024).......................11

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
    780 F.3d 1376 (Fed. Cir. 2015).........................................................................14

*Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*,
    878 F.3d 1336 (Fed. Cir. 2018).........................................................................13

*Phillips v. AWH Corp.*,
    413 F.3d 1303 (Fed. Cir. 2005).............................................................22, 23, 27

*Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*,
    962 F.3d 1362 (Fed. Cir. 2020).........................................................................13

*SunRace Roots Enter. Co., Ltd v. SRAMCorp.*,
    336 F.3d 1298 (Fed. Cir. 2003).........................................................................27

# <u>INTRODUCTION</u>

The Director's position in this appeal reflects insufficient and shifting grounds for upholding the Board's judgment of anticipation of the '011 patent by Hill.

Alleged express disclosure, though brought up at every turn, never proved a satisfactory basis for the rejection. The Examiner fell back to inherency, which WAG contested, and which the Board, though it affirmed the result, specifically declined to adopt. On rehearing, the Board for its part fell back on a broader claim construction. The Director, in its responding (red) brief ("DRB"), takes yet another approach to claim construction, which as addressed herein, is to no greater avail.

As to the first contested claim limitation ([1.i.1]), the DRB points to no evidence in Hill of a request for media data elements identifying each requested element by a serial number, transmitted as such between a media player and a media source on an internet protocol network. The DRB points repeatedly to the same disclosure that WAG pointed out in its opening (blue) brief ("BB"), *e.g.*, BB at 18, of a *lesser* request, which originates internally to the media player but is not shown as being transmitted over the actual internet protocol network to the media source in a form that includes the serial number identification of each requested element.

The DRB does not argue for the Board's stated rationale that the claim "is broad enough" to encompass a request made by an *internal* workstation component, and "does not require a *direct transmission* to the media source." Appx23 (emphasis in original).

Rather, the DRB argues an *alternate* ground for affirmance with regard to this limitation, based on the claims being *system* claims, and relying on the "instructions to cause" wording of those claims.

The argument is that instructions to cause "*x*"—

> need not also perform "*x*" themselves; they simply need to cause something in the media player to perform the step of "*x*."

DRB at 22.

But as will be addressed, while the DRB sets up the so-described *instructions* as a basis for finding anticipation, it never points to where such instructions may be found in Hill. To the extent the argument would be that Hill's operation is programmatic, and that the program instructions that cause the lesser requests described in Hill would also be capable of causing the media player to transmit the claimed requests (*i.e.*, "*x*"), the DRB fails to account for the difference that the claimed requests, unlike the lesser requests, would also have to be able to work with the protocols provided by "an IP protocol network," a fact not at all supported by the record.

- 2 -

Nor does the DRB rely on the Examiner's inherency rationale. *Compare* Appx3644 (Examiner's assertion of what a request to the media source "would necessarily include"), *with* Appx25 (Board declining to rely on inherency), *and* DRB at 30-31 (Director, same).

With regard to the equally important limitation [1.g], concerning a mechanism "operable to maintain a record of the serial number of the last media data element received and stored in the player buffer," the DRB repeatedly seeks to skirt the word "last," thus failing to provide a basis for anticipation under this limitation.

As to claim 4, the DRB is inconsistent in how it interprets the words "predetermined number" in that claim and chooses an incorrect interpretation to read on disclosures in Hill that are to a different effect than what is claimed.

In sum, nothing in the DRB is sufficient to point away from complete reversal on all grounds. [1]

---

[1] WAG also notes that the DRB, beginning at 3, confusingly devotes the first page of its discussion of the '011 patent to the *wrong embodiment*. WAG's BB at 6-9 had addressed, with no dispute by the Director, that the relevant embodiment is at col. 8-9 of the '011 specification.

## <u>ARGUMENT</u>

I. **THE DIRECTOR FAILS TO SUPPORT ANTICIPATION OF LIMITA-TION [1.i.1]: REQUESTS BY SERIAL NUMBER FROM MEDIA PLAYER TO MEDIA SOURCE**

Contested limitation [1.i.1] is as follows:

> **[1.i.1] instructions to cause the media player to transmit to the media source a request to send one or more media data elements, each identified by a serial number,**

A. **Hill Has No Express Disclosure That "the media player … transmit[s] to the media source a request to send one or more media data elements, each identified by a serial number"**

The Director presents *characterizations* to this end, which are not quotes,

and the words chosen for the characterizations overstate the disclosures of Hill. For

example, the following (with emphasis herein added) is representative of the Di-

rector's arguments:

> Using the local frame number value of the requested frame, the cliplist manager will select the appropriate source 122 and assigned source manager 120, and it will request ***the requested frame*** from the se-lected source via the selected source manager interface. Appx428 (col. 4:27-30); Appx432 (col. 12:31-34). ***In response to the request, the source returns the requested frame to the source manager***, which ar-ranges with the buffer manager to insert the returned frame into the buffer as the next global frame number. Appx429 (col. 6:14-31); *see also* Appx432 (col. 11:62-col. 12:44) (providing an example of the re-fill and prefetch operation).

DRB at 10-11 (emphasis added). A careful reading of this argument reflects that

the italicized words do not purport to be quotes, and in fact they are *not* disclosures

of Hill. Rather, they are embellishments added by the Director, as neither those

italicized words nor the substance thereof appear in the passages actually cited.

The relevant disclosures actually stand for no more than the following:

In step 314, the cliplist manager 116 requests the frames from the appropriate source manager 120. The source manager 120 in step 316 retrieves the requested frame data from the source 122.



Appx422, Appx429 (Hill, Fig. 3 & 6:13-16).

In its own rendition of "precisely" what it claims that Hill teaches, the Direc-

tor's brief recites the by-now familiar litany of the cliplist manager 116 remapping

the frame numbers for the (internal) source manager 120. But the Director then

adds:

> The cliplist manager then forwards the request *specifying the re-*
> *quested future frames by their local frame numbers* to the appropri-
> ate source 122 via the assigned source manager interface 120.
> Appx429 (col. 6:8-14); Appx430 (col. 7:46-50).

DRB at 22 (emphasis added). This, however, is also not the actual disclosure, but

again an overstating characterization. The cited 6:8-14 only addresses the cliplist

manager converting frame numbers, and the cited 7:46-50 goes no further than to

say that the cliplist manager, "forwards the request to the appropriate source." This

is the *closest* Hill gets to the Director's characterization of the reference, and what

is disclosed falls short of what the Director attributes to it.

None of the disclosures in Hill, including both the text and the figures, have the cliplist manager in direct communication with the source, because as disclosed, a further interface (the appropriate source manager) is necessary. The cliplist manager must make its requests *via* the corresponding source manager 120, another component *internal* to the "player" workstation. The source managers, 120, each interposes its own interface to the corresponding media source 122 that it manages. These interfaces may differ, for the reason that, as Hill *repeatedly emphasizes*, the sources may differ widely in their type. *See* Appx418, Appx427, Appx428, Appx430, Appx432 (Hill, Abstract, 1:13-27, 2:7-10, 2:25-28, 3:20-25, 3:50-56, 4:27-34, 7:61-63, 8:20-30, 12:17-20). The cited disclosures do not inform as to the communication that takes place *from the player* (whatever is internal to the workstation 100, which both sides herein have mapped to the "player" of the claims) *to the actual media source* 122.

Momentarily putting aside issues of claim construction (addressed separately below), it is what passes between the player (workstation 100) and the media source (source 122) that is the crux of the matter. Nothing in Hill expressly discloses requests over the path between these two nodes in which the requests specify the serial numbers of the requested elements. The Director points to requests between elements 116 and 120 *internal* to workstation 100 that may be constituted (with the corresponding serial numbers) as claimed, and that the requests are

"forwarded" from the cliplist manager 116 to the media source 122. However, WAG points out that the cliplist manager is not connected to the media source, and "the request" that is "forwarded," even to the extent it *includes* the requested serial numbers as internally requested by the cliplist manager, is actually handed to the source manager 120, and *still* has to go through a further *unspecified* interface of the source manager in order to reach the media source 122. There is no disclosure of what the source manager interface does, or what is the actual request at the point where it passes over the critical path segment between the source manager's interface and the corresponding media source.

### B.    "Instructions to Cause" Does Not Change the Result

The Director asserts, for the first time on appeal,[2] that WAG "improperly ignores the 'instructions to cause' language in the claim limitation," *i.e.*, limitation [1.i.1]. DRB at 24.

---

[2] The DRB at 17 appears to suggest that the Board relied on a rationale based on "instructions to cause" in finding that Hill met limitation [1.i.1]. This is incorrect. At page 17, the DRB refers to the Board "quoting back to its original decision," and *the DRB* at that point inserts the word "instructions," not as part of any *quotes* from the Board decisions, but again, in purported characterization thereof. In fact, neither Board decision even *uses* the word "instructions" in its rationale as to limitation [1.i.1]. The Board, in a *different* discussion, only applied reasoning based on "instructions" to the distinct "transmission rate" aspect of claim 4. Appx15-16. The word "instructions," inserted in the midst of (but not as part of) the DRB's quotations from the Board's decisions, and specifically tied in the DRB at page 17 to limitation [1.i.1], make those decisions appear to be different as to limitation [1.i.1] than they actually were. The Board's stated rationale as to Hill's disclosure meeting

It is odd for the Director, in an *ex parte* reexamination appeal, to argue allegedly overlooked limitations, as it is *the challenger* that has to show that all limitations are met.

In any case, however, the Director argues that the claimed "instructions to cause," as to limitation [1.i.1], are taught by Hill. But where are these "instructions" in Hill? The Examiner, having not relied on such an approach, never pointed to them. Likewise, the Board never pointed to them. On appeal, the Director argues them, but does not point to disclosure in Hill of instructions sufficient to cause what is claimed. The mere fact that it may be inferred that there could be instructions does not in itself identify instructions capable of causing the specified operation—certainly not on any inherency basis, which, at any rate, the Director disclaims. DRB at 17, 24, 30-31.

As already argued (BB at 45), the literal claim language (as well as the entire thrust of the specification) specifies that the path from the claimed player to the claimed media source must be over an internet protocol network. Simply to say without more that the undisclosed and unspecified "instructions" for data retrieval over *an internal workstation connection* would *also* be capable of conducting data

---

limitation [1.i.1] was *not* based on "instructions to cause." In any case, as to the Board's "broad enough" rationale, which the Director did not further argue here, WAG stands on its argument at pages 22-40 of the BB.

retrieval using *an internet protocol* would be a mere hypothesis, and one still requiring evidence.

Hill makes little mention of "instructions," directly or indirectly. Whatever instructions *might* drive data retrieval between source manager 102 and source 122, the nature of the media source will differ under different technical circumstances, and the operation of the corresponding source manager is left to the designer of each of the source managers 120—and beyond the scope of Hill's disclosure.

In this regard, Hill discloses nothing more than that source manager 120 "provides the necessary interface (i.e., hardware or software) for communicating with a source 122" (Appx428 (Hill, 4:29-30)), and that "[t]he source managers 120 may be implemented as hardware or software, as would be well known to someone skilled in the art" (Appx432 (Hill, 12:18-20))—*i.e.*, Hill does not disclose *any* particular instructions for any of the source managers 120 to fetch data; the nature of the sources may differ (*see, e.g.*, Appx418 (Hill, Abstract)) and any such instructions as there may be for a source manager for a particular type of media source (which provides the "interface" for communicating with that source, *see* Appx428 (Hill, 4:28-30)) are separately left to the interface designer. There is nothing *else* in Hill about instructions, software, routines, programs, etc. The Director's argument here would thus have to fail on this point, which is no doubt why the Director did

not attempt to address where the claimed anticipating instructions might be found in Hill. The answer is that they cannot be found in the reference.

In any case, if there were "instructions" manifested in Hill that didn't cause "*x*" in the particular examples shown, but yet were nevertheless *executable* to cause "*x*" under some other circumstances that might reasonably be assumed to be present in Hill, the Director certainly hasn't pointed to any such instructions, or how the instructions could be the same. Such multi-purpose instructions are at most a hypothetical conjecture, not a fact (and thus not substantial evidence).

As for "*x*" (it is the Director that introduced the "*x*" wording, *see* DRB at 22), the Director maps that (in the same discussion) to "transmit[ting] to the media source a request to send one or more media data elements, each identified by a serial number." *Id.* But something material is missing in the Director's characterization of the claim. The Director's changing the verb form from "to transmit" (as in the claim) to the participle "transmit[ting]" (as in the DRB at 22) avoids identifying *what agency* performs the transmission. Comparing the brief's recitation against the claim, it is seen that the Director's characterization omits the words "the media player."

The full wording is that the claimed instructions cause "*the media player* to transmit to the media source a request to send one or more media data elements, each identified by a serial number." The Director's formulation would encompass

instructions that drove (for example) the cliplist manager to do the "trans-
mit[ting]," whereas as claimed, the instructions specifically have to cause *"the me-
dia player"* "to transmit" the specified request.

Under the actual claim language, it would be insufficient to show that what
is caused by the instructions is for the cliplist manager (a wholly internal compo-
nent *within* the media player) to send requests for media data elements, each re-
quest identifying the corresponding serial numbers for the requested elements,
along some path in the direction of the media source. By the literal claim language,
it has to be the "media player" that is caused by the instructions to transmit the
specified request "to the media source." The request therefore has to be a request
that *exits from* the media player, directed therefrom to the media source, containing
the specified serial numbers, and moreover (as recited elsewhere in the claim), do
so over an internet protocol network. *That* (in contrast to the Director's formula-
tion) would be "*x*" in accordance with the claim language, which is exactly what
WAG has argued throughout. There is no evidence of instructions in Hill to cause
such a transmission by the media player such as to meet the substantial evidence
standard.[3]

---

[3] The Board's "reading of … a reference" is of course a fact question, but it is still
reviewed for substantial evidence. *See In re Express Mobile, Inc.*, No. 2023-1076,
2024 WL 2747287, at *3 (Fed. Cir. May 29, 2024). In this case, the Board cites no
substantial evidence, and there is none, that Hill discloses the requisite "request"
with serial numbers going from the player to the server.

The Director also takes the position that the instructions need not be to transmit the specified request over an internet protocol network. DRB at 28. This is also incorrect.

The character of the media source's network connection as being on an "internet protocol network" is separately specified by other claim language. Appx247 ('011 patent, 13:14-15). The claim preamble recites a "media player" "for receiving" an audio or video program, "from a media source over an Internet protocol network." *Id.* Contrary to the DRB's characterization at 28, this isn't just an argument based on "lexicography,"[4] it is an explicit claim recital. The Director's brief doesn't say why it overlooks this recital in the claims. It is in the preamble (not a point that the Director argues in any case), but provides both a definitional antecedent basis and an essential structural aspect of the data transmission medium over

---

[4] In this regard, the Director's footnote 4, at DRB 26, seeks to discount as "inapposite" WAG's citation of *Apple Inc. v. Andrea Electronics Corp.*, 949 F.3d 697 (Fed. Cir. 2020). That case was cited at BB 35-36 in support of the inference from a single embodiment in the specification, that the claimed request to the media source goes over the internet. The DRB argues that the case is "inapposite" because it claims Hill shows that the request sent over the internet includes the serial numbers of the requested elements. But this is just going in circles. The serial numbers either do or do not go over the internet connection. If they do, the Board's "construction" here is unnecessary. If *Apple v. Andrea* is "inapposite" as the Director contends, it could only be because the Director no longer relies on the Board's "broad enough" rationale as to the scope of claim 1 (Appx23) and concedes WAG's position on this point.

which the claim steps must operate. *See Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d 1362, 1367-68 (Fed. Cir. 2020).

If the intent of the Director's argument here is that the content of the "instructions" to transmit over a network would somehow be agnostic to the type of network, there is no support for this in the record. This same point was addressed above in connection with a different argument. As noted above, the programming to send a data request over different protocols would vary by the protocol and not be interchangeable—as WAG also argued from the outset. *See, e.g.*, BB at 26.

Nor can the Director now seek to fill these blanks by way of inherency.

The Director erects the strawman that "WAG argues incorrectly that the finding of anticipation relied on inherency." DRB at 24. In fact, the Board *disclaimed* reliance on inherency, after WAG had argued against inherency. Appx3836 (Req. for Reh'g at 8). However, the *Examiner's* approach at the prosecution stage, as also noted (BB at 40-41) was different. Despite what the Director now claims, the Examiner, for his part, *did* rely on inherency—what he said Hill "necessarily" entailed. Appx2975 (Final Rej. at 16).[5] But, to rebut any assertion of inherency, WAG argued from the outset that there were other ways that Hill could have

---

[5] *See, e.g.*, *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1343 (Fed. Cir. 2018) (inherency "appropriate only when the reference discloses prior art that must *necessarily* include the unstated limitation" (emphasis in original)).

worked. *See, e.g.*, Appx3700-3701. The Board, in its decisions on appeal from the Examiner, disclaimed reliance on inherency, in no uncertain terms (Appx25, Board Reh'g Dec. at 5), which disclaimer the Director nothing but echoes full-throatedly in the DRB. DRB at 17. Inherency is out of this appeal, *waived*, to the point that no such contention is even currently before the Court.

Moreover, even if the Court were to consider inherency at this stage, it could not be supported by substantial evidence.

The argument, to take what the Director has said, would be that *instructions* to cause Hill's workstation to do what Hill *discloses*, that is, to send requests by serial number from (internal) cliplist manager 116 to (internal) source manager 120, over a path internal to workstation 110, must be taken as *capable* of causing the same requests to be made from (internal) source manager 120 to (external) source 122, on a different type of connection, in particular, an internet protocol network. There is no evidence of this, as pointed out above.[6]

---

[6] The Director has not argued for "implicit" disclosure short of inherency. In any case, the record fails to provide a basis by which a POSITA "would at once envisage" in the disclosure that the source manager interface identically mirrors the incoming request from the cliplist manager, out to the media source. *See Kennametal, Inc. v. Ingersoll Cutting Tool Co.,* 780 F.3d 1376, 1381 (Fed. Cir. 2015). To the contrary, the current record, including the intrinsic record of the '011 patent itself, reflects the materially different character of the internet protocol connection to the media source, which a POSITA would see as something other than a mere pass-through from the internal path.

## II.     THE DIRECTOR FAILS TO SUPPORT ANTICIPATION OF LIMITATION [1.g]: MAINTAIN RECORD OF THE SERIAL NUMBER OF LAST MEDIA DATA ELEMENT RECEIVED AND STORED

Contested limitation [1.g] is as follows:

> **[1.g] instructions to implement a player buffer manager, for managing a player buffer established in the memory [an earlier recited claim element], operable to maintain a record of the serial number of the last media data element that has been received and stored in the player buffer**

The DRB repeatedly states that Hill discloses maintaining records of frames that have been "received and stored" in Hill's buffer. *E.g.*, DRB at 31-32.

Whatever the merit of that assertion, the claim language here requires more, that is, "instructions to implement" a control apparatus in the claimed player that is "operable to maintain a record of the serial number of the *last* media data element that has been received and stored in the player buffer." Limitation [1.g] (emphasis added).

The claimed apparatus may know which elements have been requested. It may know, and even have a record of, which elements have been received and stored. But part of this limitation is also to maintain a record of the "last" media data element "received and stored." The DRB fails to address this with any support of substantial evidence. Simply repeating the words "received and stored," as the DRB does, does not address *maintaining a record* of the serial number of the *last*

media data element received and stored, and thus fails make the case for anticipation.

The DRB refers to two areas of disclosure in Hill:

- Cols. 6-7: Appx429-430, Hill 6:49-7:56
- Col. 12: Appx432, Hill 12:21-44

With reference to the disclosure at cols. 6-7 of Hill, the DRB refers to 6:60-63:

> The buffer fill level refers to the number of future frames currently being stored in the buffer manager **118,** not frames that have been requested but not yet received.

And then, it refers to 7:43-45:

> The buffer manager 118 does this [checks the buffer level to verify that it is filled 10 frames ahead] by checking to see if it has frames 21 through 31 [*i.e.*, the next 10 frames beginning from the frame following frame 20].

But neither of these disclosures reflects maintaining a record of the serial number of the *last* frame received. The only way the decision here under appeal seeks to meet this limitation is to further assume that the frames, separately requested, are received in order, such that the last requested is thus the last received. Appx12 (Board decision at 12). However, this assumption is not supported by the reference, especially for an internet protocol source. BB at 45; *see* Appx244-245 ('011 patent, 8:66-9:2) ("It should be understood that data might arrive at the media player out-of-sequence and that processes in the media player or the media player buffer manager are responsible for properly arranging this data.").

Nor does the disclosure at col. 12 of Hill address the requisite claim aspects.

In its *entire* context, it says this:

> An example operation might proceed as follows. The control unit **114** requests global frame number 95 from the cliplist manager **116**, which forwards the request to the buffer manager **118**. The buffer manager **118** returns this
> 25 frame (or the closest available frame) and determines whether any new frames need to be requested.
>
> Assuming normal playback speed and a request threshold of **10**, the buffer manager **118** will check to see if global frames 96 through 106 are currently being stored, or whether
> 30 they have been requested. The most likely case is that all but frame 106 will be requested or already stored. In this case, the cliplist manager **116** maps global frame 106 to clip **2**, local frame 17, then requests this frame from the second source manager **120**. Note that clip **1** occupies frames 1
> 35 through 89 of the global playback sequence, clip **2** occupies 90 through 213. Thus, global frame number 106 corresponds to local frame 17 (106–89) in clip **2**.
>
> When that frame is received, the source manager **120** will arrange with the buffer manager **118** to have it inserted into
> 40 the buffer as global frame 106.
>
> If all of the global frames 96 through 106 have been requested or are stored in the buffer, no new frames will be requested. If more than one frame is needed, at most two will be requested.

Appx432, Hill, 12:21-44 (emphasis added). Note that this operation reads forward, starting with a request for frame 95, and tries to maintain a buffer ten frames ahead.

The disclosure says, that on each fetch of a frame from the internal buffer for playback, to check and see if the next ten frames (ten being the set "request threshold") after the current request (96-105) "are currently being stored, or whether they

have been requested." In the example given, frame 95 is needed for playback, and thus the forward "check" to be performed is for frames 96-105. "In this case" (*i.e.*, in the case those upcoming elements are present in the buffer or at least have been requested), a request is generated (to go to one of the source managers 120) for the frame that would *next* be 10 ahead, in this case, frame 106. In this particular disclosure, stated with the words "stored … *or* … requested," the word "or" fails to inform as to which of frames 96-105 have been received, let alone disclose a maintained record of the serial number of the *last* of those frames that was *received*. The further fact (as argued at DRB 19) that frames are inserted into the buffer when received (lines 38-40) speaks to an action (a transitory event) but does not speak to maintaining any "record" (*i.e.*, some type of a persistent notation) of having received the frame, or of having received it "last," as claimed.

The DRB also argues that the claimed "record" is manifested "when the buffer manager checks the final value in the buffer fill level sequence to determine whether the buffer manager needs to request new frames to refill the buffer." DRB at 19. But "final" (the DRB's word, not Hill's), only means the last in storage sequence, not last in time, unless one further assumes that the frames arrive in order.

The DRB then tries to string these arguments together, seeking to tie them to Examiner findings allegedly "agreed with" by the Board:

> More specifically, as the Examiner found, Hill teaches that the buffer man[a]ger 118 differentiates between frames that have been *requested*

> and frames that have been *received and stored* in the buffer and main-
> tains records of each that are used when the buffer manager adds new
> frames to the buffer and determines whether a request for new frames
> is needed. Appx3647 (citing Appx432 (col. 12:27-40)). The Board ex-
> pressly agreed with the Examiner's findings and confirmed that Hill's
> disclosure of the buffer management, prefetching, and refill operations
> satisfy this limitation. Appx11; Appx25-26.

DRB at 31-32. Again, what is cited falls short. As for what the Board concluded, at

the cited Appx11, the Board simply equated "last requested" with "last … re-

ceived," with no substantial evidence for equating the two. At Appx25-26, the

Board's rehearing decision simply refers to "reasons discussed previously" for the

"request" limitation [1.i.1], which fails to address the argument it needed to ad-

dress, which was WAG's argument, that: "There is no determinable relationship be-

tween that [knowing the last element requested] and knowing the serial number

(clip number and local frame number) of the last frame that has been received 'by

the media player....'" Appx3837 (Req. for Reh'g at 9).

    The DRB further seeks to rely on the following:

> If all of the global frames 96 through 106 have been requested *or
> are stored in the buffer*, no new frames will be requested....

DRB at 33 (emphasis in original) (quoting Appx432, Hill,12:41-44). However, the

word "or" in this citation undercuts the conclusion argued and in any case does not

address what was last stored.

    As for the DRB's reliance on the Examiner (the cited Appx3647), he was

simply attempting to read into Hill's same disclosure at 12:25-44 the further aspect

of maintaining a record of the *last* element received, which simply is not there. The Examiner then takes the insertion of arriving elements into the buffer (every one successively being the "last"), as somehow also constituting "maintaining a record" of such events, but as disclosed, these events are transitory, with no disclosure of maintaining any actual record.

Finally, the DRB resorts to distorting the record to create the impression that *some* evidence *does* reflect a record maintained of the serial number of the "last" element received and stored. The conclusion it urges is the following:

> Thus, Hill discloses that the last requested frame is the same as the last frame received and stored in the buffer. This disclosure provides substantial evidence….

DRB at 35-36. But this is based on a fallacious premise, directly preceding it in the DRB:

> Here, the buffer manager adds one to the global frame number 30—i.e., ***the last frame received and stored in the buffer***, as depicted in Figure 5A....

DRB at 35 (citing Hill, 7:45-50) (emphasis added). Note once again that the above is a quote from the Director's brief, and *that it is not a quote from Hill*.

Despite its assertions at DRB 35-36, the actual words of the cited portion of Hill (Appx430 (Hill, 7:45-50)) do not make any disclosure about "the last frame received and stored." This disclosure speaks not of requests based upon

- 20 -

understanding of what was *last received*, but only on *distance* based upon the global frame number value:

> Normally, **the most distant frame** has not been requested. Assuming this is the case, the buffer manager **118** will then request global frame **31**.

Appx430 (Hill, 7:45-47) (emphasis added). *In fact, nothing in Hill (either in its textual disclosure or the referenced Fig. 5A or any other figure) says that global frame 30 was "the **last** frame received and stored in the buffer."*

In sum, the Examiner, then the Board, and now the Director, have all consistently disregarded the word "last" in this limitation, or in the case of the Director, resorted to reliance on mere *characterization*, where actual evidentiary support was lacking for this aspect of the claim language.

None of the assertions as to alleged disclosure by Hill of limitation [1.g] are supported by substantial evidence.

## III.    THE DIRECTOR FAILS TO SUPPORT ANTICIPATION OF CLAIM 4: RECEIVE THE PREDETERMINED NUMBER OF MEDIA DATA ELEMENTS AT A RATE MORE RAPID THAN THE [PLAYBACK] RATE

Contested claim 4 is as follows:

> **4. The media player of claim 1, wherein the instructions for causing the media player to request from the media source a predetermined number of media data elements further causes the media player to receive *the predetermined number* of media data elements at a rate more rapid than the rate at which the media data elements are to be played out by the media player.**

WAG's BB asserts that there is not substantial evidence that Hill teaches "instructions that … cause[] the media player to receive *the predetermined number* of media data elements at a rate more rapid than the [playback] rate…." *See* BB at 51-52. That is, the instructions must be effective to cause the specified higher rate to be achieved across "the predetermined number" of elements, and Hill fails to teach this. *Id.*

## A.     Claim Construction: "the predetermined number" in Claims 1 and 4

As will be addressed, the term "the predetermined number" is used in both claim 1 and claim 4 and presumably has the same meaning in both claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("claim terms are normally used consistently throughout [a] patent").

The DRB is internally inconsistent, however, in how it corresponds the disclosures of Hill with the term "the predetermined number" as used in claim 4.

Early on in the DRB, it identifies a "predetermined" value used in Hill as the player buffer fullness target, comparable in this regard to claim 1:

> Buffer manager 118 monitors the buffer fill level—*i.e.*, the number of frames received and stored in the buffer—and compares it against a ***predetermined request threshold value***. *Id.* (col. 6:58-67).

DRB at 10 (emphasis added). This is the DRB's own at least initial characterization, corresponding Hill's *request threshold* with a "predetermined … value."

But pages later, when the DRB gets to specifically addressing claim 4, it changes gears on what it maps from Hill onto the words "the predetermined number" as used in that claim. When specifically addressing claim 4, the DRB would find this term taught by Hill's disclosure of requesting an "identified number of *refill frames*." DRB at 36-37 (emphasis added). In that context, the DRB references "a predetermined number of frames—*viz.*, two new frames...." *Id.* This interpretation, corresponding the "two new [refill] frames" in this disclosure from Hill with the "predetermined number" of elements in claims 1 and 4, differs from the Hill "request threshold" that the DRB initially identified as representing "a predetermined number" of elements at page 10.

The "two [refill] frames" interpretation that the DRB adopts at page 36-37 specifically with respect to claim 4 is incorrect, because (as further addressed below) it is contrary to how the words in question are used in the subject claims. *See Phillips*, 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms…. This court's cases provide numerous similar examples in which the use of a term within the claim provides a firm basis for construing the term.").

### 1.    *Claim 4 Antecedents*

Claim 4 depends from claim 1, reciting:

> 4. The media player of claim 1, wherein ***the instructions*** for causing the media player to request from the media source a

predetermined number of media data elements [cause a further operational condition (addressed *infra*) to be met].

This is clearly referring back to the antecedent of "the instructions" of claim 1:

1. A media player … comprising …

[1.e] ***instructions*** to cause the media player to request from the media source ***a predetermined number*** of media data elements;

Claim 1 doesn't specify what the value of the predetermined number must be, or when the value is predetermined. But claim 1 does later refer to "the" predetermined number, as the media player claimed in claim 1 further comprises:

[1.i] instructions to cause the media player … [1.i.2] to repeat transmitting the requests to the media source for sequential media data elements ***so as to maintain the pre-determined number of media data elements in the player buffer*** until [done receiving the program].

Here, the antecedent in claim 1, limitation [1.i.2], of "the pre-determined number" of elements to "maintain" in "the player buffer," is the same "predetermined number" first loaded into the same player buffer in limitation [1.e]. This is also the same "the predetermined number" that is referenced later in dependent claim 4 (a material point that the DRB at page 41 leaves out). Claim 4 thus reads:

4. The media player of claim 1 wherein the instructions wherein the instructions for causing the media player to request from the media source a predetermined number of media data elements further causes the media player to receive ***the predetermined number*** of media data elements at a rate more rapid than the rate at which the media data elements are to be played out by the media player.

The words "the predetermined number" in claim 4 thus refer to the number of me-

dia data elements that must, in accordance with claim 4, be received by the media

player more rapidly than the playback rate. That number is the same number that,

per the parent claim 1 (incorporated in claim 1 by dependency), the media player

must, by repeating its requests to the server, seek to "maintain" in its buffer during

playback.

### 2.    *Specification Disclosure*

The foregoing interpretation is confirmed by the specification disclosure.

First, as disclosed, all transmissions in response to the client requests are faster

than the playback rate:

> The media data will be transmitted to the user computer as fast as the
> data connection between the user computer and the server will allow.

Appx244 ('011 patent, 8:42-45).[7] Second, the specification likewise reflects a pre-

load of a predetermined number of media data elements into the player buffer, and

then repeated requests to maintain this level as data is played out, mirroring what is

claimed:

> The user computer is associated with a media player software incorpo-
> rating a user buffer and comprises means for receiving and storing ***a
> predetermined number*** of media data elements, playing the data out
> sequentially as audio and/or video, and deleting media data elements
> from the buffer as they are played out. As data is played out, the next
> sequential data elements are requested from the server in such a

---

[7] The '011 patent also presumes that the connection is faster than the playback rate. *See* BB at 50-51.

fashion as to approximately maintain ***the predetermined number*** of data elements in the user's buffer.

Appx244 ('011 patent, 8:58-66) (emphasis added).

### B.     Hill Does Not Disclose Claim 4 as Properly Construed

WAG's position is that it is Hill's "request threshold" that corresponds to "the predetermined number" of claim 4.

In Hill's data fetch examples, both in cols. 6-7 and col. 12 of its disclosure, the request threshold is set to 10. Appx429, 432 (Hill, 6:43, 12:27-28). Thus, 10 is "the predetermined number" for the player buffer fullness target in the examples provided in Hill.

The Director takes a different position, that each time the player requests data, the number of elements that it requests is "the predetermined number." Hence, when Hill's player requests two frames, encoded at 24kbps, and receives them at 48kbps (twice the playback rate), "the predetermined number" is 2 and claim 4 is thus satisfied (according to this argument). DRB at 41.

But this alleged correspondence is incorrect, as a matter of claim construction. There are *two separate request recitals* in claim 4 when rewritten in independent form:

> [1.e] instructions to cause the media player to request from the media source a predetermined number of media data elements;

[1.i.1] instructions to cause the media player to transmit to the media source a request to send one or more media data elements, each identified by a serial number,

These are two separate recitations, in different words, in the same claim, and should be presumed to refer to different things, rather than redundantly repeating the same thing, much like in the case of a parent and a dependent claim. *See, e.g.*, *Phillips*, 413 F.3d at 1341-15; *SunRace Roots Enter. Co., Ltd v. SRAMCorp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003); *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1362 (Fed. Cir. 2006); *Arendi S.A.R.L. v. Oath Holdings Inc.*, 2019 WL 3891150 at *2-3 (D. Del., Aug. 19, 2019).

A *first* data fetch is recited in limitation [1.e]. This is for "a predetermined number" of media data elements. This gets the claimed process going.

A data fetch is recited *for the second time* in limitation [1.i.1], this time for "one or more" media data elements—*not* for "the predetermined" number. This request in limitation [1.i.1], *i.e.*, the referenced "the request" in claim 4, is also *repeated* "so as to maintain the pre-determined number of media data elements in the player buffer [for the duration of playback]."

The claim thus distinguishes the [1.e] request for "a predetermined number" of media data elements from the [1.i.1] requests for "one or more" media data elements, which are repeated "so as to maintain" the predetermined number of media data elements in the player buffer.

In Hill, the number of "two" elements requested at high speed does not correspond to "the predetermined number" because nothing in Hill correspondingly states a request threshold of two elements. Two (Hill's "refill" number, according to the DRB) corresponds (at best) to the incremental limitation [1.i.1] request number made repeatedly in Hill *to refill* the buffer. It is 10 (the request threshold) and not 2 in that example that corresponds to "the predetermined number" of claims 1 and 4.

The DRB makes no attempt to argue that Hill teaches instructions effective to cause the player there to receive 10 elements (or any other number of elements corresponding to a preset "request threshold") faster than the playback rate in response to a request for that number of elements.

## **CONCLUSION**

Reversal is therefore warranted on all points.

Dated: May 19, 2025                        Respectfully submitted,
New York, NY 10174

                                                   /s/ Ronald Abramson
                                                   Ronald Abramson
                                                   Ari J. Jaffess
                                                   Liston Abramson LLP
                                                   The Chrysler Building
                                                   405 Lexington Avenue, 46th Floor
                                                   New York, New York 10174

                                                   *Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    The foregoing complies with the type-volume limitation of Federal Circuit

Rule 32(b)(1) and Fed. R. App. P. 32(g)(1) because:

> this paper contains <u>6,980</u> words, excluding the parts of the paper ex-
> empted by Fed. R. App. P. 32(f) and Federal Circuit Rule 32(b)(2).

2.    The foregoing complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this paper has been prepared in proportionally spaced typeface using
> <u>Microsoft Word</u> in <u>14-point Times New Roman</u>.

Dated: May 19, 2025                        Respectfully submitted,
New York, NY 10174

                                           <u>/s/ Ronald Abramson</u>
                                           Ronald Abramson
                                           Ari J. Jaffess
                                           Liston Abramson LLP
                                           The Chrysler Building
                                           405 Lexington Avenue, 46th Floor
                                           New York, New York 10174

                                           *Counsel for Appellant*